# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

| | |
|---|---|
| EARNEST C. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:18-CV-97 PLC |
| | ) |
| ANDREW M. SAUL[1], | ) |
| Social Security Commissioner, | ) |
| | ) |
| Defendant, | ) |

## MEMORANDUM AND ORDER

Plaintiff Earnest Jones seeks review of the decision of Defendant Social Security Commissioner Andrew Saul, denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

### I.     Background and Procedural History

In July 2015, Plaintiff, who was born August 1977, filed applications for DIB and SSI, alleging he was disabled as of April 15, 2014 due to "cervical spine injury, spinal cord displacement, severe canal stenosis, tears in thecal sac, narrowing foramina, spinal stenosis, nerve movement, central disc protrusion, drop foot syndrome on left foot, limited movement of left arm, [and] arthritis."  (Tr. 192-204, 221)  The Social Security Administration (SSA) denied Plaintiff's claims in February 2016, and he filed a timely request for a hearing before an administrative law

---

[1] Andrew M. Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

judge (ALJ). (Tr. 130-31) The SSA granted Plaintiff's request for review and conducted a hearing in September 2017. (Tr. 38-80)

In a decision dated January 12, 2018, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from April 15, 2014 through the date of this decision[.]" (Tr. 17-28) Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-8) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ[2]

A. Hearing Testimony

Plaintiff testified that he was forty-years old and lived with his parents and thirteen-year-old son. (Tr. 41-42) Plaintiff, who had a tenth-grade education and a GED, previously worked for a lumber company. (Id.) He stated that he stopped working in April 2014 when he "bent over to pick up some lumber and put it … on my forklift, and when I bent over this whole side went numb and I lost movement in my left leg and left arm." (Tr. 40-41)

Plaintiff testified that he experienced headaches "probably twice a day," lasting an "hour to two hours." (Tr. 44) Plaintiff also experienced "constant" pain "in the back of my neck, down my arms, and down my spine." (Tr. 45) When he moved his head, he felt a "sharp, grabbing pain" and heard a "grinding sound." (Id.) Plaintiff explained that the pain goes "all the way to my hands," and he felt "numbness and tingling" in his hands and fingers "all the time." (Tr. 46) Plaintiff was unable to "hold onto things and grab things" with his left hand. (Tr. 47) When he

---

[2] Because Plaintiff challenges the ALJ's determination of his physical residual functional capacity, the Court recounts only the evidence relating to his physical impairments.

2

tried to lift more than two pounds with his left hand, "it pinches up in here and in my neck" and he dropped things.  (Id.)  Plaintiff testified that he underwent surgery, which helped his headaches but "[e]verything else stayed the same."  (Tr. 49)

Plaintiff stated that he also had degenerative disc disease in his lower back and "the pain is terrible and shoots down both my legs and it makes walking hard or standing up hard."  (Tr. 52-53)  He estimated that he experienced spasms in his back "four or five times a day."  (Tr. 53)  Plaintiff walked with a cane, which his doctor recommended, because his "left leg drags," and he estimated that he fell "[p]robably three times a month."  (Tr. 41)  Plaintiff explained that he had to "think about every step … conscious every step or the front of my foot will bend down and drag and I'll fall."  (Tr. 51-52)  Plaintiff stated that his pain caused him to awaken every hour, or five to six times, per night.  (Tr. 63)

Plaintiff testified that, on a typical day, he went back to bed after his son left for school and slept until around noon.  (Tr. 55)  He spent most of the day lying down.  (Tr. 65)  Plaintiff was able to bathe himself using a chair and handheld showerhead, but his son helped him dress by putting on his shoes and socks.  (Tr. 62)  Plaintiff would sit on a stool while he rinsed dishes and loaded the dishwasher for ten minutes at a time, and would then need to lie down for thirty to forty-five minutes.  (Tr. 61)  Due to the problems with his hands, Plaintiff could not use a can opener, zip a jacket, or open a car door with his left hand, and he "ha[d] trouble" holding silverware and coffee cups with his left hand.  (Tr. 72-73)  Plaintiff stated that he used his right hand to drive, open doors, and text.  (Tr. 73-74)

Plaintiff drove the twenty-minutes to his son's school about three times per week to pick up his son from practice.  (Tr. 59)  After driving, Plaintiff would lie down for an hour.  (Tr. 60)  If he drove longer than twenty minutes, he had "to stop and get out" because he "stiffen[ed] up and

the muscle spasms real bad and my back starts hurting and neck starts hurting." (Id.) Plaintiff stated that, when he went grocery shopping, his son would collect the groceries and Plaintiff would lean on and push the cart. (Tr. 60-61) Plaintiff went grocery shopping twice a month and spent about forty-five minutes at the store. (Tr. 61)

A vocational expert also testified at the hearing. (Tr. 76-80) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age and education, and no relevant past work, who was able to perform sedentary work with the following limitations:

> The individual would be able to lift or carry ten pounds occasionally, five pounds frequently; stand and/or walk for two hours of an eight-hour day, sit for six hours of an eight-hour day …. [N]o climbing, no balancing; occasional stooping; no kneeling, crouching or crawling …[T]he hypothetical individual would be able to frequently reach, handle, finger, and feel.  The hypothetical individual I'm describing would need to avoid any hazards such as dangerous machinery, unprotected heights … [and] would be able to perform simple and routine tasks throughout the workday.

(Tr. 77-78)  The vocational expert stated that such an individual would be able to perform unskilled jobs in the national economy, such as table worker, document preparer, and addressing clerk. (Tr. 78)  When the ALJ reduced the hypothetical individual's ability to handle, finger, and feel to occasional, the ALJ stated that such person would not be able to work. (Tr. 78-79)  The vocational expert also testified that missing more than one day of work per month would eliminate competitive employment. (Tr. 79)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his "Statement of Uncontroverted Facts" and the Commissioner admitted. [ECF Nos. 18-1, 23-1] The Court also adopts the facts set forth in the Commissioner's "Statement of Additional Material Facts," because Plaintiff did not refute them. [ECF No. 23-2]

### III. Standards for Determining Disability Under the Social Security Act

4

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920.  Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work.  Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

**IV.    The ALJ's Decision**

The ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 and found that Plaintiff:  (1) had not engaged in substantial gainful activity since April 15, 2014, the alleged onset date; and (2) had the severe impairments of degenerative disc disease of the cervical and lumbar spine and depression.  (Tr. 19)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20)

The ALJ found that, although Plaintiff's "medically determinable impairments could reasonably be expected to produce the [] alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 22-23)  The ALJ discredited Plaintiff's subjective complaints of disabling pain because:  (1) his injury occurred in April 2014, but he did not seek treatment until May 2015; (2) Plaintiff did not seek the assistance of a pain management specialist until six months after receiving the referral; (3) Plaintiff declined occupational therapy; (4) Plaintiff reported improvement after surgery; (5) Plaintiff's doctor noted that Plaintiff's medications were controlling his pain; and (6) Plaintiff's activities of daily living were inconsistent with the allegations of disabling pain.[3]  (Tr. 23-24)

After reviewing Plaintiff's testimony and medical records, the ALJ determined that Plaintiff had the RFC to perform sedentary work except that:

> [T]he claimant cannot climb, balance, kneel, crouch or crawl.  The claimant can occasionally stoop and can frequently reach, handle, finger and feel.  The claimant should avoid hazards, such as dangerous machinery and unprotected

---

[3] The ALJ also found that Plaintiff's depression was less severe than he alleged because Plaintiff: (1) had no mental health diagnosis; (2) did not receive consistent treatment from mental health professional; and (3) did not allege significant limitation due to mental symptoms.  (Tr. 24)

> heights.  The claimant can perform simple and routine tasks throughout the workday.

(Tr. 22) Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform any past relevant work, but he had the RFC to perform jobs that existed in significant numbers in the national economy, such as document preparer, table worker, and addressing clerk.  (Tr. 26-27)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 27)

## V.  Discussion

Plaintiff claims the ALJ erred in determining his RFC because:  (1) the ALJ did not assign appropriate weight to the opinion of his primary care physician, Dr. Early; and (2) substantial evidence did not support the RFC determination. [ECF No. 18]  In response, the Commissioner asserts that substantial evidence supported the ALJ's evaluation of the medical opinion evidence and RFC determination.

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome."  Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence."  Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir.

7

2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Treating physician

Plaintiff argues that, because Dr. Early was his treating physician, his opinion was entitled to controlling weight.  The Commissioner counters that the ALJ properly considered and assigned partial weight to Dr. Early's medical opinion.

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[4]  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.  Id.  This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians.  See 20 C.F.R. §§ 404.1527, 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

---

[4] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency.  20 C.F.R. §§ 404.1520c, 416.920c.  Plaintiff filed his application in 2015, so the previous regulations apply.

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Plaintiff's earliest record of treatment for back pain was dated May 2015, approximately one year after his alleged onset date. (Tr. 290) Plaintiff's then primary care physician prescribed naproxen and Flexeril and refilled Plaintiff's hydrocodone. (Tr. 299-300) He also ordered an MRI, which revealed: "annular tear with mild to moderate stenosis at L4-5"; "tiny central disc herniation at L5-S1"; and "abnormal signal at the level of C5-6 on the left side of the spinal cord with associated severe canal stenosis secondary to disc ridge osteophyte complex." (Tr. 288-89)

Plaintiff established care with Dr. Early in October 2015, and Dr. Early referred Plaintiff to pain management specialist, Dr. Reed.[5] (Tr. 304) Plaintiff presented to Dr. Reed in November 2015 and reported low back pain, bilateral leg pain, and a recent fall. (Tr. 446) Dr. Reed diagnosed Plaintiff with lumbar spondylosis, sacroiliac disorder, degeneration of lumbar intervertebral disc, lumbosacral radiculopathy – bilateral, and spasm – bilateral. (Tr. 449) Dr. Reed prescribed MS Contin and Percocet, continued Robaxin and Naprosyn, and, two weeks later, administered a

---

[5] Between December 2015 and December 2016, Plaintiff continued to see Dr. Early for treatment of his anxiety and difficulty sleeping. (Tr. 319-23)

9

lumbar medial branch block x4 bilaterally with fluoroscopy. (Tr. 449, 471) In January 2016, Dr. Reed administered another lumbar medial branch block x4 bilaterally with fluoroscopy. (Tr. 431)

Plaintiff returned to Dr. Reed's office in February 2016 and rated his pain as 5/10. (Tr. 355) In March 2016, Plaintiff reported that his pain was worsening and rated it as 10/10, and Dr. Reed performed radiofrequency ablation of Plaintiff's lumbar spine the next month. (Tr. 350-52, 379)

In September 2016, Dr. Early ordered an MRI, which revealed "extremely high-grade spinal stenosis at C5-C6 and C6-C7 with some cord edema. Findings are combination of endplate hypertrophy, disc protrusions and retrolisthesis." (Tr. 334-35) The following month, Plaintiff presented to orthopedic surgeon Dr. Goldstein. (Tr. 507) Plaintiff explained that the "pain begins in his neck and radiates upwards to his skull and wraps around to the front of his skull." (Id.) Plaintiff also complained of "intermittent numbness and tingling that begins in his neck and radiates to the left shoulder and down into his left arm and hand." (Tr. 507) He denied dexterity problems, stating that he was able to perform tasks such as buttoning and writing without difficulty, but he reported "intermittent weakness … causing him to drop certain objects." (Tr. 507)

On examination of Plaintiff's upper extremities, Dr. Goldstein noted:  sensation intact to light touch over right extremity; "paresthesia and burning in C6, C7, C8 distributions with light touch sensation testing on left extremity"; full range of motion at elbow, wrist, and fingers; strength 4/5; normal grip strength; "reflexes 2+ R elbow and wrist, brisk 3+ in [left upper extremity]"; and "no Hoffman's sign on right, questionable on the left." (Tr. 508) In regard to Plaintiff's lower extremities, Dr. Goldstein observed that his sensation was intact to light touch and his strength was 4/5. (Id.) Finally, Dr. Goldstein examined Plaintiff's spine and recorded "significant

10

tenderness to palpation at the midline of the cervical spine, as well as the paraspinal muscles in the cervical region." (Id.)

In November 2016, Dr. Goldstein performed "C5-7 and C6 to C7 anterior cervical discectomy and fusion with allograft reconstruction and anterior plate fixation." (Tr. 474-77) Following the surgery, Plaintiff received physical therapy at the hospital. (Tr. 496-97) Two days post-surgery, Plaintiff reported he had "been up to the bathroom several times, got up and brushed his teeth this morning, and is feeling better today." (Tr. 500) Plaintiff "completed ambulation in hallway" but was "still demonstrating some balance deficits." (Tr. 501). The physical therapist recommended Plaintiff continue to use a cane upon discharge, and she informed the occupational therapist that Plaintiff "is not in need of skilled OT services at this time and is independent in ADLs." (Tr. 493)

Plaintiff followed up with Dr. Goldstein two weeks later and reported that "overall he [has] been doing well since surgery." (Tr. 514) Plaintiff stated that: "the pain in his left upper extremity has gotten much better"; "[t]he numbness and weakness that he experiences in his left lower extremity and left upper extremity is also improved significantly"; "his balance is [] much improved"; and "the headaches that he was experiencing before surgery have [] resolved." (Id.) On examination of Plaintiff's upper extremities, Dr. Goldstein noted that sensation was intact to light touch, strength was 5/5, reflexes 2+ at elbows and wrists; and Hoffman signs were negative. (Id.)  In his lower extremities, Plaintiff's strength was 5/5, except on the left ankle dorsiflexion and knee flexion, where it was 4/5. (Id.)  There was no tenderness in the cervical, thoracic, or lumbar spine and sensation was grossly intact in all dermatomes. (Tr. 503)

When Plaintiff returned to Dr. Goldstein's office in December 2016, he stated that he "has been doing quite well." (Tr. 517) He reported "a little bit of discomfort at the posterior cervical

11

thoracic junction but states that his preoperative headaches have completely improved." (Tr. 517) He also continued to experience "some numbness in the left upper extremity but notes that his balance seems to have gotten better and feels as if surgery has been a 'great success.'" (Id) On examination, Dr. Goldstein noted "grade 5 power in all upper extremity myotomes except for intrinsics on the left-hand side which are 4+ out of 5 strength." (Id.) Dr. Goldstein discontinued Plaintiff's cervical collar, recommended home exercises, and prescribed a topical compound cream for muscle spasm and cervical thoracic pain. (Tr. 518)

In February 2017, Plaintiff presented to Dr. Early with complaints of low back pain and requested a referral to a different pain specialist.[6] (Tr. 319) Dr. Early refilled Plaintiff's MS Contin and Percocet. (Id.) When Plaintiff saw Dr. Early in early March 2017, he expressed concern about his elevated blood pressure and inability to sleep. (Tr. 318) Plaintiff returned later that month to discuss with Dr. Early his "medication and disability." (Id.)

At Plaintiff's appointment with Dr. Early in early May 2017, Dr. Early noted that Plaintiff's "pain [was] being managed by meds" and refilled his oxycodone and MS Contin. (Tr. 317) When Plaintiff returned to Dr. Early's office in late May 2017 for a medication refill, Dr. Early wrote that Plaintiff's "medication [was] working well." (Id.)

That month, Dr. Early completed a medical source statement (MSS) for Plaintiff on a checklist form. (Tr. 311-14) Dr. Early opined that Plaintiff was able to: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and walk thirty minutes at a time for a total of two hours during an eight-hour day; and sit thirty minutes at a time for a total of three hours in an eight-hour day. (Tr. 311) Dr. Early stated that, due to "numbness, tingling of hands + legs," Plaintiff would need to be able to shift positions at will and "walk around" four times a

---

[6] The record does not contain documentation of treatment by a pain specialist after February 2017.

12

day for about ten minutes.  (Id.)  Dr. Early also stated that Plaintiff could occasionally[7] twist, stoop (bend), crouch, climb stairs, climb ladders, reach, handle, finger, and push/pull with upper and lower extremities.  (Tr. 312)  Finally, Dr. Early estimated that Plaintiff would miss more than four days of work per month and be off task twenty percent of the workday.  (Tr. 313-14)

The ALJ considered Dr. Early's MSS, acknowledged that he was a treating physician, and found that "some of his opinions are supported by the record."  (Tr. 25)  In particular, the ALJ credited Dr. Early's opinion that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and walk approximately two hours in an eight-hour workday, and occasionally stoop, crouch, and climb.  (Id.)  The ALJ found, however, that other limitations included in Dr. Early's MSS were not consistent with Plaintiff's medical records.  Specifically, the ALJ stated that the limitation to sitting for a maximum of three hours, missing more than four days of work per month, and being off task for twenty percent of the workday were "not consistent with the claimant's greatly reduced need for medical intervention" and "objective improvement" since the surgery.  (Tr. 25-26)  Finally, the ALJ observed that Dr. Early's opinion was expressed "in the form of a standard, check box form that offers little explanations as to how the conclusions were reached" and "inherently limits the persuasive value of any opinion."  (Tr. 26)  The ALJ therefore assigned Dr. Early's opinion "partial weight."  (Id.)

The ALJ properly evaluated Dr. Early's MSS and provided "good reasons" for partially discrediting it.  The ALJ acknowledged that Dr. Early was Plaintiff's treating physician and summarized his treatment notes.  (Tr. 24-25) The ALJ noted that, following Plaintiff's November 2016 surgery, Dr. Early referred Plaintiff to pain management and refilled his medications.  The

---

[7] According to the MSS, "occasionally" means "from very little up to 1/3 of an 8 hour day."  (Tr. 312)

13

ALJ also observed that, at Plaintiff's most recent appointments in May 2017, Dr. Early noted: "pain being managed by meds" and "medications working well." (Tr. 24)  The fact that Plaintiff's medications were effectively managing his pain undercut the severe limitations identified by Dr. Early.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).

The ALJ explained that Dr. Early's treatment notes and the records' "minimal references to the claimant's back issues" were inconsistent with the severe impairments included in Dr. Early's MSS.  "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotation marks omitted).  Although Dr. Early's handwritten treatment notes are brief and somewhat difficult to read, it appears that Plaintiff did not complain of upper or lower extremity symptoms after the November 2016 surgery.  While Plaintiff complained to Dr. Early of low back pain in February 2017, such complaints did not appear in Dr. Early's treatment notes from March or May 2017.  The absence of references to pain, numbness, or weakness in Dr. Early's treatment notes is inconsistent with the severe limitations he included in the MSS.  See, e.g., Wiles v. Colvin, No. 12-5053-CV-SW-ODS, 2013 WL 1947295, at *3 (W.D. Mo. May 10, 2013) (The absence of complaints to a treating doctor is a substantial basis for rejecting Plaintiff's claim that he was suffering from debilitating pain.").

Plaintiff argues that the ALJ improperly weighed Dr. Early's opinion because the ALJ did not address the factors set forth in 20 C.F.R. §§ 404.1527, 416.927.  Although the ALJ neither cited the regulations nor addressed all of the non-controlling factors set forth therein, "the ALJ is not required to cite specifically to the regulations and need only clarify whether he discounted the

14

opinion and why." Dames v. Berryhill, No. 2:16-CV-80 NCC, 2018 WL 1455862, at *6 (E.D. Mo. Mar. 23, 2018). See also Grable v. Colvin, 770 F.3d 1196, 1201–02 (8th Cir. 2014) (quotation omitted) ("An ALJ need only clarify whether it discount[ed] [a treating physician's] findings, and, if it did so, why.")

Plaintiff also argues that the checklist form of the MSS was "an inadequate reason[] for not applying more weight" to Dr. Early's MSS. [ECF No. 18 at 10]  Dr. Early's opinion was primarily in the checklist format and a provider's checkmarks on a form are conclusory opinions which can be discounted if, as is the case here, contradicted by other objective medical evidence. Stormo, 377 F.3d 801, 805–06 (8th Cir. 2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). See also Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011) (checkmarks on a MSS are conclusory opinions which can be discounted if contradicted by other objective medical evidence).  The Court finds that substantial evidence supported the ALJ's decision to assign Dr. Early's opinion partial weight.

C.  RFC

Plaintiff claims the ALJ erred in determining his physical RFC because it was not supported by substantial evidence. More specifically, Plaintiff contends that the ALJ improperly drew his own inferences from the medical records and mischaracterized his physicians' treatment notes.  The Commissioner counters that substantial evidence in the record as a whole supported the ALJ's decision.

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical

15

records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox, 495 F.3d at 619). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." Id.  Furthermore, "in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox, 495 F.3d at 619.

In his decision, the ALJ thoroughly reviewed and summarized Plaintiff's medical records. (Tr. 22-27)  The ALJ discussed Plaintiff's MRIs, medical diagnoses, history of treatment with narcotic pain medication and lumbar medial branch blocks, and significant improvement following the November 2016 surgery.  ALJ noted that:  in the days after the surgery, Plaintiff was able to ambulate and declined occupational therapy; at his first surgical follow-up, Plaintiff stated that the pain, numbness, and weakness in his upper left extremity had improved and his headaches had resolved; and at his next appointment, Plaintiff stated that the surgery was a "great success" and his symptoms had improved.  (Tr. 23-24)

The objective medical evidence supported the ALJ's finding that Plaintiff's condition improved after the surgery. Plaintiff's post-surgery physical examinations revealed intact sensation in upper and lower extremities, upper extremity strength of 5/5, and lower extremity strength of 5/5, except for the left knee and ankle, which was 4/5.  Whereas Plaintiff had "significant tenderness to palpation" in the cervical region before surgery, he had no tenderness after surgery.  Improvement in strength and diminished pain supported the ALJ's finding that Plaintiff was not disabled.  See Lochner v. Sullivan, 968 F.2d 725, 728 (8th Cir. 1992).  The ALJ

16

also considered evidence that Plaintiff's medications were controlling his pain.  As previously stated, an impairment is not disabling if it can be controlled by treatment or medication.  Brown, 611 F.3d at 955.

The ALJ incorporated into his RFC determination those impairments and restrictions he determined to be credible.  See, e.g., George v. Astrue, 2011 WL 976704, at *13-14 (E.D. Mo. 2011).  The ALJ found that, while Plaintiff's degenerative disc disease limited Plaintiff's ability to work, he could perform a "less than full range of sedentary work including multiple postural and manipulative limitations."  (Tr. 24)  The ALJ factored Plaintiff's back pain and extremity numbness, weakness, and tingling into the RFC by limiting to Plaintiff sedentary work with:  no climbing, balancing, kneeling, crouching, or crawling; occasional stooping; frequent reaching, handling, fingering, and feeling; and no exposure to hazards, such as dangerous machinery and unprotected heights.  (Tr. 22)  It is apparent that the ALJ conducted a detailed analysis of the objective evidence of record, and of Plaintiff's testimony, and formulated a specific RFC that took into account all of Plaintiff's limitations that the ALJ found credible and supported by the record.

Plaintiff argues that the ALJ mischaracterized Plaintiff's treatment records when he cited Dr. Goldstein's statement that Plaintiff denied dexterity problems, because Plaintiff had also complained of numbness, tingling, and weakness and reported dropping cups.  Plaintiff argues that the ALJ relied on this mischaracterization of the evidence to find that Plaintiff was able to use his arms and hands.

This isolated notation in Dr. Goldstein's records, however, was not the sole evidence relating to Plaintiff's ability to use his arms and hands.  The ALJ pointed to Plaintiff's improved upper extremity symptoms after the surgery.  For example, Plaintiff informed Dr. Goldstein that the numbness and weakness in his left arm and hand had "gotten much better."  Furthermore, Dr.

Goldstein's physical examination revealed intact sensation and almost full strength in his upper extremities.  Additionally, Plaintiff's activities of daily living established that he had some ability to use his hands, as he was able to drive, prepare meals, and help clean.  Upon review of the ALJ's decision, it is clear that the dexterity comment was not the basis for the ALJ's finding that Plaintiff could use occasionally reach, handle, finger, and feel.

Plaintiff also argues that the ALJ "erroneously states that *Plaintiff stated* that he did not need Occupational Therapy as he was independent in his daily activities." [ECF No. 18 at 14 (emphasis in original)]  However, the ALJ's statement was consistent with the medical records, which provided: "[Patient] declined need for OT intervention."  (Tr. 496)  To the extent that Plaintiff challenges the ALJ's recitation of Plaintiff's ability to perform daily activities in the hospital following the surgery, the Court finds any error was harmless.  The ALJ properly considered evidence of Plaintiff's improvement in the weeks and months after surgery and recounted the activities of daily living he reported at the hearing and in his function report.

An ALJ's decision is not to be disturbed "so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact."  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff identifies evidence supporting a different conclusion, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.  See Fentress v. Berryhill, 854 F.3d 1016, 1020 (8th Cir. 2017).  The Court therefore finds that substantial evidence supported the ALJ's RFC determination.

## VI.     Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports Defendant's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

                                                                                     _____
                                                                                     PATRICIA L. COHEN
                                                                                     UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of April, 2020